2022 IL App (1st) 201208

FIRST DISTRICT
SIXTH DIVISION
February 4, 2022

No. 1-20-1208

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 16490 |
| | ) | |
| CHARLES SOTO, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Charles Soto was convicted of predatory criminal sexual assault of a child and aggravated criminal sexual abuse and sentenced to consecutive prison terms of 10 and 4 years. On appeal, defendant contends that the trial court erred in not dismissing his case for a prejudicial six-year preindictment delay. He contends that the State failed to disclose the complainant's felony conviction and the alleged victim's failure to identify defendant. He contends that the court erred in admitting the prior statement of the alleged victim. He also contends that the court erred in denying his motion for an evidentiary deposition of a physician to whom the alleged victim denied being abused and his motion to bar the alleged victim from identifying defendant at trial. He contends that the evidence was insufficient to convict him beyond a reasonable doubt. He contends that the court erred in denying his motion for a mistrial for the alleged victim testifying in violation of an order *in limine*. Lastly, he contends that the trial court lacked jurisdiction because

the State did not prove at trial that the offense occurred in Illinois. For the reasons stated below, we affirm.

¶ 2                                                    I. JURISDICTION

¶ 3      On March 12, 2020, a jury found defendant guilty of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. The court sentenced him to a total of 14 years' imprisonment on October 22, 2020, and he filed his notice of appeal that day. Thus, this court has jurisdiction in this matter pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                                    II. BACKGROUND

¶ 5      Defendant was charged in a November 2018 indictment with predatory criminal sexual assault of a child and aggravated criminal sexual abuse, both allegedly committed in Cook County, Illinois, against T.L. on or about August 15, 2012, when she was under 13 years old and he was at least 17 years old. Allegedly, the former consisted of defendant inserting his finger in T.L.'s anus, and the latter consisted of defendant touching his penis to her hand for purposes of his or her sexual arousal or gratification. Both counts recited that the limitation period was extended pursuant to section 3-6(j) of the Criminal Code of 2012 (720 ILCS 5/3-6(j) (West 2012)) because T.L. was under 18 years old at the time of the offenses and the prosecution was commenced within 20 years of her 18th birthday.

¶ 6                                               A. Other-Crimes Evidence

¶ 7      The State filed a motion to introduce other-crimes evidence or to join this case with another pending case against defendant, No. 18-CR-16489. In that case, defendant was charged with

aggravated criminal sexual abuse of J.S. between September 2009 and October 2011, when J.S. was about 12 years old and defendant was about 32 years old. The State alleged that, on five occasions, defendant sat with J.S. as she watched television on the couch in defendant's home and felt her breasts and vaginal area. The State alleged regarding T.L. that defendant was an acquaintance of her mother through a substance abuse clinic where she was treated and he worked. When T.L. was six years old, he brought her to his home to play with his daughters but while there placed his penis in her hand on the pretense that they were playing a game and then took her to the bathroom where he penetrated her anus. The State alleged that T.L. reported the incident to her mother upon returning home and her mother in turn reported the incident.

¶ 8    The State argued that the other crimes were admissible to show defendant's propensity to commit sexual assault. See 725 ILCS 5/115-7.3 (West 2012). The earlier offenses occurred within two years of the instant offenses, defendant victimized children in his home in both cases, and the State argued that the probative value outweighed any prejudicial effect. The State also argued that the other crimes were admissible to show defendant's intent and motive.

¶ 9    Defendant responded to the motion, arguing that the alleged offenses were not similar, including that the alleged victims were significantly different in age, nor proximate in time. "The State is attempting to take one unreliable, uncorroborated allegation and bolster it with another unreliable, uncorroborated allegation to create a false illusion of credibility." He also argued that State had not disclosed the nature of the evidence it would use to show the other crimes so that the defense could not evaluate or properly rebut that the evidence was otherwise admissible.

¶ 10    Following arguments, the court found that both offenses occurred in defendant's home less than a year apart, when other children were present in the home but no other adults were, and both

victims were girls under age 13 for whom defendant was in a position of trust, but there was no continuing narrative or common method between the offenses. The court denied joinder and use of the other-crimes evidence for *modus operandi*, motive, or lack of consent, the latter because children are unable to consent. It admitted the other-crimes evidence to show intent, identity, absence of mistake, and propensity. The court stated that it would give a limiting instruction before and/or after introduction of the evidence at defendant's request.

¶ 11                    B. Admission of T.L.'s Statements

¶ 12    The State filed a motion for a hearing on the admissibility of statements by T.L. See *id.* § 115-10. T.L. gave a statement on August 24, 2012, to Lauren Glazer during a victim-sensitive interview at the Child Advocacy Center (Center). Attached to the motion was a video and transcript of the interview.

¶ 13    In the interview, Glazer introduced herself and told T.L. that "you're not in any kind of trouble" and "you can tell me anything that you want." T.L. then said she went to the hospital " 'Cause the man touch me" and "was making me touch his goobey gun and he was touching my butthole." The man was Charlie, a bodyguard, and it was a Wednesday. She was at his home because "my momma let me go" "on a play date but it didn't—everything got bad." He drove her there in his car. He took his dog for a walk, then they watched a movie and she asked to play with his daughter's dolls. His daughters were not there; they visited him overnight but did not live there.

¶ 14    T.L. was having fun, wearing his daughter's clothes. He "was playing a game with the goobey gun he think it was funny I say eww and he said what and I said I don't wanna play this game anymore." She indicated that a "goobey gun" is on the front of a boy and used for "going pee-pee." She called it a goobey gun, not Charlie. She did not see Charlie's goobey gun because

"he covered my eyes *** and he made me touch his goobey gun." Her eyes were covered by a black sleeping mask of his daughters, and he told her to guess and "put his hand on me *** and made me touch his goobey gun." She guessed it was a brush and then "said goobey gun and I said eww what's that." He said nothing to her guess. She knew it was a goobey gun because "I heard to zipper a little bit." She did not feel anything come out of his goobey gun and he did not make any noises or sounds when she touched it. When she said she did not want to play the guessing game, she "got off the bed."

¶ 15    When asked what happened with her butthole, T.L. replied that "[h]e put his finger" in "deep—deep—deep" and it hurt. He did it while she was sitting on the bed, and he said nothing while he did it for "like eight minutes." He made her take her clothes off and then put them on again, and she changed clothes in the bathroom from her own clothes to his daughter's shirt and pants he provided. When asked "I thought you told me you were in the bathroom when he put his finger in your butthole, where were you?" T.L. answered "In the room—it's his daughter's room." When asked what made him stop, T.L. replied "Like he do that to his daughters like I don't know I never seen his daughters before." He did not tell her that he "does that" to his daughters, and "I don't know what he do to his daughters—I don't know what he do." Later, he told her it was time to go home. Before Charlie took her home, he told her not to tell anyone. She agreed "but I tricked him." Her parents were not home when she arrived home, but she told her "whole family" including her sister Sarah and brother Marcus, and then her mother when she came home. Sarah, about 15 years old, was "really angry about my momma" because "they just let me go with that man." When asked how she knew the man, T.L. replied "I know him about 15 days."

¶ 16 Glazer asked T.L. if she understood what truth and lies are. She said "You're supposed to tell the truth so they can arrest the man." When asked if it would be a lie if someone said a dog was sitting in a nearby chair, she first said it would be the truth and then admitted it would not be true. When asked if it would be true for someone to say she was 2, or 12, years old, she said that would be true or real. T.L. said she would "make paper about" what a goobey gun is, and Glazer replied "[a] picture well that's a good idea" but then ended the interview. At two points during the interview, T.L. said she had a headache and asked to take a break, and at another point she asked for a drink for her dry throat, but Glazer told her that it was important they should continue.

¶ 17 Defendant responded to the motion, arguing that the statement was inadmissible under section 115-10. Corroboration of the statement is relevant to its general reliability as required by section 115-10, defendant argued, but there was no physical corroboration of T.L.'s account. Carter, T.L.'s mother, did not report the alleged incident to the police first but to the clinic, and she gave no statement in her own words. Defendant did not just know Carter from the clinic but was a long-time friend of T.L.'s father. As to T.L. herself, she could not tell the difference between truth and lies, and there were two discrepancies in her account: where defendant allegedly touched her anus, and an accusation that defendant also abused his daughters that she quickly retracted. Also, T.L. told a physician that she was not abused, casting doubt on her account.

¶ 18 In support of the last claim, defendant attached a page from a report of a November 1, 2012, examination of T.L. by Dr. Aloysius Jackson "for medical clearance for DCFS." In relevant part, the report states under the heading "History of Present Illness" that:

"The patient presents with 7 [year old female] with DCFS worker and forster [*sic*] mom for medical clearance. Mild cough and clear runny nose for one and a half week. No fever. Feeding well 3 times a day. Child denies abuse."

¶ 19    Following the hearing, during which the parties stipulated to video of the interview, the court granted the State's motion. The court described the evidence at issue: a video-recorded victim-sensitive interview with only T.L, and Glazer present. Glazer "asked nonleading, open-ended questions," and T.L. corrected her more than once. As soon as Glazer said T.L. was not in trouble and could tell anything she wanted, T.L. said "I went to the hospital. 'Cause the man touch me, 'cause he was making me touch his goobie-gun and he was touching my butthole." T.L. told how defendant brought her to his house to play with his daughter's dog, played a movie for her, pulled her pants down, and took a picture with his phone of her vaginal area. She held her legs together and tried to cover it with her hands, but he moved her hands. T.L. pointed to where the "goobie-gun" is on a man and made clear that she meant the penis. She described defendant's "game" where he blindfolded her and asked her to identify objects. She heard his zipper, and then he put his hand on her wrist, pulled her arm towards his "goobie-gun," and made her touch it. She told him she did not want to play the game. T.L. pointed to her "butt hole" and described how defendant penetrated it with his finger, causing her pain. He told her not to tell anybody, and she agreed but then told her parents when she went home that night.

¶ 20    The court found "consistency of repetition of the two acts charged," that T.L. used terminology that "was not typical for a child of age 6 years," and that she "seemed relaxed when talking, but frequently covered her eyes with her hands." Reiterating that Carter did not attend the interview, the court found "[n]o motive to fabricate" by T.L. or Carter and that any delay in

reporting by Carter was not attributable to T.L. The court noted discrepancies in T.L.'s statement. She said that defendant touched her anus in the bedroom but then, when Glazer noted that she had said it happened in the bathroom, said it happened in the bedroom of defendant's daughter. Also, she said defendant "does the same things to his daughters" but then said she did not know and never saw his daughters before. The court found that defendant could argue the discrepancies at trial but in context of the entire interview "they do not demonstrate that 6-year old T.L. was incapable of telling the truth or that she fabricated the entire interview." The court found T.L.'s statements admissible, "provided T.L. testifies at trial" and subject to a limiting instruction. "However, T.L. cannot testify about defendant taking a photo of her vaginal area, because that is not a charged act and would be prejudicial to defendant."[1]

¶ 21　After the court ruled, defense counsel told the court that the defense may stipulate regarding the photograph. The court stated that the defense could choose to do so as part of its strategy but evidence of defendant photographing T.L. would be barred otherwise.

¶ 22　　　　　　　　　　　　　C. Delay Claims

¶ 23　Defendant filed a speedy trial demand on December 10, 2019, after the court decided the other-crimes motion but before the court decided the section 115-10 motion.

¶ 24　In February 2020, after the court ruled upon the section 115-10 motion, defendant filed a motion to dismiss "based upon a six year investigative delay which has substantially prejudiced him and deprived him of due process of law." He claimed that the alleged attack of August 15, 2012, was investigated by police from August 22 until December 2012. At that time, the

---

[1]The video and transcripts in the record have been redacted to remove these references, except for a brief mention to Charlie taking a picture of T.L.'s "front" in a copy of the transcript not used at trial.

investigating detective reported that Carter and T.L. could not be found and asked for the investigation to be suspended until defendant could be found and arrested. However, the investigation included preparing, but not executing, a search warrant for the correct address of his home on Tripp Avenue in Chicago so that the police were aware of where he lived. While he moved in March 2014 to another address, he "has never resided out-of-state, has never been incarcerated and has maintained continuous employment since 2012 in the State of Illinois." Thus, he argued, there was no need to suspend the investigation in 2012 until he could be found.

¶ 25    He argued that he was prejudiced by the delay from 2012 to his November 2018 arrest. First, he no longer had the cell phone he had in 2012 and thus could no longer refute the claim that he photographed T.L.'s vaginal area. Secondly, while a police report stated that defendant offered Carter a play date for T.L., defendant claimed that T.L.'s father could have refuted that but he died in 2017. Thirdly, the police report stated that Carter reported the incident to her substance-abuse clinic because she knew defendant from there but did not know his last name. However, defendant averred that his employee identification from the clinic showed his last name. Police apparently did not seek to interview the clinic employee Carter allegedly spoke with and now it was impracticable for defendant to find the employee and obtain "potentially exculpatory testimony." Lastly, Carter was now unavailable as a witness and could not be examined regarding her motive to implicate defendant so that she could recover damages from the clinic as his employer.

¶ 26    Defendant supported his motion with attached copies of police reports, the search warrant complaint, the certificate of the 2017 death of T.L.'s father Clint, and defendant's affidavit.

¶ 27    The State responded to the motion to dismiss, arguing that defendant's speedy trial demand belied his allegations that he was unprepared for trial due to delay in charging him. The State also

argued that his claims of prejudice were speculative, he was claiming for the first time that the play date did not happen, any testimony from the clinic employee would be hearsay, and the police reports showed that Carter was unavailable since essentially the beginning of the case in 2012. The State argued that defendant did not satisfy his burden of demonstrating prejudice.

¶ 28    The court denied the motion to dismiss in March 2020. It concluded from its review of cases that dismissal was "an extreme sanction when there has been willful destruction of evidence." While there was a failure to seek or gather evidence here, which the court found inexplicable, any prejudice was likely to the State because prosecutors "through no fault of their own have to put a case on with all of those things that were not done by the officers." In other words, the State was likely deprived of the opportunity to corroborate T.L.'s testimony. The investigation issues go to the weight and not the admissibility of evidence, the court stated, and the defense could examine the lack of an investigation and related matters on cross-examination.

¶ 29                                        D. Deposition Motion

¶ 30    Defendant filed a motion for an evidence deposition of Dr. Jackson based on the November 2012 report in which he reported that T.L. "denies abuse." Defendant claimed that Dr. Jackson was practicing medicine in South Carolina and sought a deposition by video conference to preserve his testimony in lieu of the State stipulating to the admission of his November 2012 report.

¶ 31    Following arguments, the court denied the motion. It noted that the report concerned an examination months after the alleged incident and for a different purpose than investigating the incident. It found that "the single line, no sexual abuse noted, is not relevant to this case."

¶ 32                    E. Motions *in Limine*

¶ 33    The defense's written motion *in limine* sought to exclude (1) Carter's statement to police on August 22, 2012, arguing that it was testimonial because police were investigating an alleged crime with no element of responding to an ongoing emergency and (2) references to defendant photographing T.L.'s vaginal area as it would elicit uncharged misconduct. It also sought to bar T.L. from making an identification at trial, arguing that she made no pretrial identification.

¶ 34    At the hearing just before the March 2020 trial, the State informed the court that it had just found Carter in a hospital after not having been able to find her and had already informed the defense. The State did not plan to call Carter as a witness or introduce her statements, so the court granted defendant's motion to bar her statement. As to T.L. making an identification at trial, the State argued that defendant was not a stranger to T.L., who described in her interview how she knew defendant. The court denied the motion on this point, remarking that T.L. could identify defendant at trial "if she can."

¶ 35    Defendant then argued that if T.L. made an in-court identification, "I have to put a context to that. I have to present a defense. The defense, as I have stated in previous motions, is that" police reports reflected that Carter first reported the alleged incident to the clinic "and when not enough was done to her satisfaction" then a week later reported it to the police. The court found that this argument went to the weight of any in-court identification by T.L. rather than its admissibility. Defense counsel stated that he wanted to withdraw his motion *in limine* regarding Carter's statement to police so that he could elicit that Carter said she reported the alleged incident to the clinic before she went to the police. The State argued that would be inadmissible hearsay and only Carter could testify to her motivations for who and when she reported the incident. The court

decided to reserve its decision regarding Carter's statement to police but then, after a short reflection with no further argument, decided to allow the defense to ask a police witness if he was aware that Carter went to the clinic before she went to the police, noting that the State could introduce evidence as to why Carter was not in court.

¶ 36    When the court turned to whether to exclude evidence that defendant photographed T.L., defense counsel said "I was thinking strategically of putting it in based on no search of his phone. He could have proved his innocence *** but I decided to put it in [the motion] and accept the court's invitation to ban it." Reiterating that photographing defendant was uncharged misconduct, the court granted the defense motion to bar evidence on the point. The State noted that it had redacted such evidence from the victim-sensitive interview video and transcript.

¶ 37    The parties and the court agreed that the jury would be instructed before "the witness" testifies that evidence of uncharged conduct will be presented and should be considered only for the limited purposes of intent, identity, absence of mistake, and propensity to commit a sexual offense. We shall refer to this as the limited-purposes instruction.

¶ 38                              F. Trial Evidence

¶ 39                              1. Johanna R.

¶ 40    After the court gave the jury the limited-purposes instruction, Johanna R. testified that she used to live in Chicago and was defendant's ex-wife. He was born in 1978, and she and others referred to him as "Charlie." During their marriage until their 2006 separation and 2009 divorce, they had three children, the oldest being J.S., a daughter born in 1999. After the divorce, defendant had sporadic visitation, including overnight visits, with his children including J.S. Defendant married again in 2009 to Jasmin Nunez, who had at least one child of her own. Defendant lived in

an apartment with Jasmin, moving "a lot" but, to Johanna's knowledge, last lived on a street named Tripp for "a few years." Johanna also remarried in 2009 and moved to Florida in 2014.

¶ 41    During the period of 2009 into 2011, J.S. had to repeat the fifth grade. During that year and the following summer, J.S. visited defendant. When J.S. completed summer school, defendant wanted her to visit without her siblings and Johanna agreed. J.S. then spent weekends at his home. When it was time for J.S. to leave for defendant's home, she "didn't want to go." Johanna told her that she had to go, acknowledging to her that "he wasn't really a consistent father," in belief that that was the basis of her objections, and telling her "to give him another chance." During that period, defendant was working as "a security guard" at a clinic called El Rincon. At trial, Johanna identified a photograph as depicting J.S. in 2011 and another photograph as depicting said clinic.

¶ 42    In November 2014, Johanna communicated with J.S.'s boyfriend using a device that J.S. used; that is, she posed as J.S. for an online conversation. After doing so, Johanna asked J.S. if there had been an incident between herself and defendant in Chicago. J.S. said "what happened," Johanna consoled her, and they went to a police station the next day.

¶ 43    On cross-examination, Johanna testified that her divorce from defendant was amicable in that it was mutually desired. She no longer had any relationship with defendant and did not like him. She did not discuss defendant with her children, who had not visited him since 2014. She denied terminating visitation and maintained that he did not exercise it. She had taken her children to visit their paternal grandparents, including when defendant was present.

¶ 44    When Johanna went to the police in Florida, they printed the relevant messages from the device she used to pose as J.S. The text conversation lasted only a few minutes. Counsel asked "one of the things he text[ed] was can I have a picture of you baby?" and Johanna acknowledged

it. Counsel then asked multiple questions to elicit why J.S.'s boyfriend would ask for her picture if he knew what she looked like. Johanna posing as J.S. then texted that Johanna was making J.S. return to Chicago. This was not true, Johanna testified, but she wanted J.S.'s boyfriend to leave J.S. alone.

¶ 45    On redirect examination, Johanna clarified that the reply of J.S.'s boyfriend to Johanna making J.S. return to Chicago was "tell her what your dad did" and "OMG, she wants you to die." Johanna as J.S. asked what the boyfriend meant, and he replied "he molested you." Johanna then went to J.S. to ask what it meant, and J.S. screamed "who told you?"

¶ 46    On recross examination, Johanna acknowledged that the readout of the text conversation was not coherent and seemed to be out of sequence, with some of Johanna's messages missing.

¶ 47    After Johanna's testimony, the court again gave the limited-purposes instruction.

¶ 48                                    2. J.S.

¶ 49    After the court gave the limited-purposes instruction yet again, J.S. testified that she was born in 1999 and now 21 years old. Johanna is her mother and defendant her father, and she identified defendant at trial as the latter. She referred to defendant as Charlie since she was 11. For 15 years of her life, up to when she moved to Florida with her mother and siblings, she lived in Chicago. After her parents divorced, she lived with Johanna and rarely visited defendant; visits were rare because he rarely wanted visits. After he remarried, he had a small dog. His new wife's daughter had her own bedroom with a television and many toys including drawers of dolls, while J.S. had a shared bedroom with no television or toys when she and Johanna lived with defendant.

¶ 50    J.S. repeated the fifth grade in 2011 when she was 11. During that time, she visited defendant a few days a week because he wanted more visits. He lived with his wife Jasmin and

her daughter, who was two years younger than J.S. Jasmin and her daughter were sometimes there when J.S. visited but mostly visits involved defendant and his children sitting on the living room couch watching television. When asked if anything happened while they did so, J.S. replied that defendant sat next to her and put his hands in her underwear and bra. This happened two or three times when J.S.'s siblings sat on the floor in front of the couch. She did not tell anyone due to fear that Johanna, being "very protective," would "do something" to defendant and she "would lose her." She did stop visiting defendant. After J.S. completed summer school, defendant asked Johanna to have J.S. visit overnight, and she went reluctantly. Nobody but her and defendant were there, and he asked her to sleep with him. She initially refused, but he insisted and she complied. "I didn't sleep, he touched me and I didn't sleep the whole night." He touched her "[i]n my underwear." She went home the next day but again told nobody out of fear. She had not returned to defendant's home since then and saw him only occasionally at family gatherings. When Johanna confronted J.S. in November 2014, she told Johanna what happened and they went to the police in Florida.

¶ 51 On cross-examination, J.S. testified that she had resented defendant's stepdaughter having a television in her bedroom, considering it symbolic of defendant taking care of her better than his own children. J.S. denied still being resentful about it. Most visits were at defendant's home, but some were at his parents' home. When defendant molested J.S. on the couch and her younger siblings were sitting in front of the couch, the television was showing cartoons so her siblings would be distracted and unlikely to turn around. Though she was shocked the first time defendant molested her, she did not cry out or object because she was afraid, nor did she tell Johanna when she got home. She acknowledged that her fear that Johanna would attack defendant was irrational

as her mother was not a violent person. She kept returning to defendant's home after he molested her because "I was a child, I didn't understand what was happening" and was afraid to tell Johanna.

¶ 52    When Johanna learned of defendant's actions in mid-November 2014, neither J.S. nor her boyfriend wanted J.S. to be sent back to Illinois as Johanna had threatened. Johanna took J.S. to the police station in early December. J.S. did not write a statement, though she was interviewed and there was video and notes of that interview. When asked if the police report stated that she said she had not seen defendant since she was in the second grade, she replied that she had said she had not seen him since the last time she stayed overnight at his home. When asked if she "actually" said she was molested five times, she replied that the "interview was a few years ago so I can't remember specifically how many times I said he touched me but he touched me." She admitted that she did not tell police about defendant molesting her in his bed as she stayed overnight.

¶ 53                                3. T.L.

¶ 54    T.L testified that she was born in October 2005 and was 14 years old as of trial, and her sister was her guardian since 2012 when she was six years old. She now lived at a specified address on Lawndale Avenue in Humboldt Park. In 2012, before her sister became her guardian, T.L lived with her mother Carter and her father Clint, and they moved often. T.L. went to El Rincon clinic often then because Carter was being treated there, and they usually walked there. T.L. would play by herself in the play area while Carter was treated. She recalled a security guard at the clinic, whom Carter spoke with once. She could not describe him, and when asked to look around the courtroom to identify anyone she recognized from the clinic, she could not. However, she remembered the name "Charlie Soto" when asked "the name of any security guards" at the clinic.

¶ 55    On August 15, 2012, T.L. was at the clinic with Carter but left with Soto when her parents took her to his van. He took her alone—that is, without her parents—to his apartment. Upon arriving there, Soto and T.L. took his "small fluffy white dog" for a walk around the block. When they returned to his apartment, they were alone there. T.L. had been told that Soto had daughters, and she was going to a playdate with them, but she did not see them that day or indeed ever meet them. Soto and T.L. were sitting on the couch watching a movie when he suggested playing a guessing game: she would be blindfolded and guess what she was touching. He took her to a bedroom with pink wallpaper and asked her to change into clothes he provided. She changed in the bathroom and returned to the bedroom. When she was blindfolded with a bandanna, he guided her right hand towards himself and she touched something, but she was not sure at the time what she touched nor could she recall at trial hearing a noise before he guided her hand. She told him that she did not want to continue the game and released what she was touching. She took off the bandanna with some difficulty, and he did not help her remove it. He pulled down her pants and had her leaning over the bed, then put his finger in her anus. He told her to mention when it hurt, and she did, but he did not stop immediately. When he stopped, he told her to put her own clothes back on. When she did, he took her in his van to her home. Soto told her not to tell anyone what happened, and she told him she agreed but crossed her fingers because she knew she would tell someone. Her parents were not home but returned in about an hour. She told Carter, who told Clint.

¶ 56    About a week later, T.L. went to the hospital with Carter and was examined by a physician and a nurse. A few days later, she went with Carter to the "Chicago Children's Advocacy Center," where someone interviewed her about what happened in Soto's home. At trial, T.L. identified

photographs of the clinic where Carter was treated and Soto worked, the play area of the clinic where T.L. waited during Carter's treatment, and T.L. herself on the day she was interviewed.

¶ 57 On cross-examination, T.L. reiterated that she recognized the clinic even though it may not have looked exactly the same in 2020 as it had in 2012. No adults were present when she played in the play area of the clinic waiting for Carter. When asked if she recalled more than one security guard at the clinic, T.L. replied that she only recalled Soto being a guard and the only other man she recalled from the clinic was a therapist named George. Security wore dark uniforms. She did not view a photographic array or lineup in 2012 or since nor was she asked to describe Soto. When asked at trial to describe her attacker, she testified he was a Hispanic man, tall, chubby, and balding with glasses and a beard but no mustache or tattoos that she recalled. She recalled that the incident occurred on August 15, 2012, a Wednesday, and reiterated that Carter was the first person she told about the incident and Carter then told Clint. Carter was hospitalized, and Clint died about two years before trial. She could not recall where Soto's apartment was except that it was a second or third-floor unit in a reddish-brown brick building not far from Humboldt Park but not in that neighborhood.

¶ 58 T.L. viewed the video of her interview shortly before trial. She acknowledged saying in the interview that Soto took her to his home in a car, rather than a van as she testified, but explained that she now knows the difference between a van and a car but did not when she was interviewed at six years old. She acknowledged that she did not mention the pink wallpaper in the bedroom during the interview, and she was recalling that detail from memory though she was in Soto's home only once, on the day of the incident. She had not seen Soto since that day either. She acknowledged saying in the interview that she was blindfolded with a mask, not a bandanna, but

again attributed her misstatement then to her age then. She did not acknowledge saying in the interview that she knew her assailant for 15 days.

¶ 59 When counsel asked T.L. if she said in her interview that she was sitting on the bed when the assailant put his finger in her anus, she replied "When I was sitting on the bedroom that is when he took a picture of my front part and then he put—so—he told me that—I'm sorry, can you repeat the question?" Counsel said "So here is what I'm trying to get at" before the court *sua sponte* struck T.L.'s answer and instructed the jury to disregard it. Counsel then repeated his question, and T.L. replied that she was laying on her stomach on the bed when she was penetrated.

¶ 60 On redirect examination, T.L. testified that she had no relationship with Carter since 2012 and was raised by her sister since the incident.

¶ 61                                    4. Nitza Fernandez

¶ 62 Nurse Nitza Fernandez testified to examining T.L. in the emergency room of St. Mary's Hospital "on Division" on August 22, 2012, and to reviewing her notes on that examination before trial. T.L. arrived with Carter, and Fernandez and a physician examined T.L. for possible sexual assault. Fernandez spoke with T.L. and learned that she had a scheduled play date with an acquaintance of Carter six days earlier. T.L. reported that "the man pushed his finger deep up her rectum/anus, and made her touch his genitals with her hands." While T.L.'s anus was examined, no swabs were taken due to the passage of time. T.L. seemed otherwise healthy and "oriented to time, place, and person" appropriately for her age. Based on the information from T.L., the hospital reported the matter to "Chicago police and DCFS."

¶ 63 On cross-examination, Fernandez acknowledged that the reported date of the incident, August 15, was eight days before the examination. Her notation of six days was an estimate. Had

- 19 -

swabs been taken, they may have been useful for "touch DNA forensics." The pants T.L. was wearing during the incident could have been a possible source of evidence, but her pants were not taken into evidence. T.L. did not have lacerations, bleeding, abrasions, or bruising, but Fernandez was not necessarily expecting any from the report of a finger in her anus. T.L. was not treated during the examination insofar as she was not given medication, sutures, or bandages.

¶ 64                                  5. Interview of T.L.

¶ 65     The parties stipulated to video of the 2012 victim-sensitive interview of T.L. as redacted. Glazer, a social worker, testified that she conducted the interview of T.L. at the Chicago Children's Advocacy Center on August 24, 2012, and that the video accurately reflected the interview. It was unusual that T.L. disclosed the abuse "right away." Glazer asked T.L. about the difference between truth and lies because that was the practice at the Center at the behest of the Cook County State's Attorney's office. When Glazer worked elsewhere conducting similar interviews, she did not ask about the difference between truth and lies. At the Center, police and prosecutors, but not the general public, could watch an interview in progress through a one-way mirror.

¶ 66     The video of the interview as redacted—that is, with all references to defendant photographing T.L.—was played in court. *Supra* ¶¶ 13-16.

¶ 67     On cross-examination, Glazer testified that she would confer with the detective investigating a case so that she would have some details about the allegations before conducting an interview. The detective here was Detective Al Krok of the Chicago Police Department. She could not recall if she met Carter before T.L.'s interview or otherwise, but the parent or guardian who would bring a child to the Center would not be involved in the preinterview conference. Glazer did not use an anatomically correct doll in interviewing T.L. because it was not the Center's

practice to use such dolls, and Glazer disagreed with the proposition that pointing to such a doll makes it easier for a relatively inarticulate child to give his or her account.

¶ 68 While photographic arrays were sometimes used in Center interviews, Glazer did not conduct an array with T.L. and was not asked to conduct one. T.L. identified her assailant only as "Charlie the bodyguard," without last name or physical description. Glazer also did not ask T.L. to describe Charlie's home. T.L. never indicated that Charlie had an erection, ejaculated, or moaned. She did not say that Charlie penetrated her as she lay on the bed on her stomach but instead as she sat on the bed. Glazer asked her about her use of the term goobey-gun to determine from whom she learned or picked up that term. T.L. had replied that she called it a goobey-gun, and in Glazer's experience only T.L. used that term. Glazer did not then ask why she used that term. Glazer could not recall why she did not follow up on T.L. drawing a goobey-gun. Glazer could not recall if T.L. referred to being at Charlie's home on a playdate using that word. Though she would have wanted to know how T.L. came to be at his home, she could not recall asking that.

¶ 69                           G. Further Trial Proceedings

¶ 70                                 1. Mistrial Motion

¶ 71 The defense moved for a mistrial due to T.L. testifying in violation of an order *in limine*, arguing that the State has a duty to prepare its witnesses so that they do not testify to barred evidence. Counsel acknowledged that the court struck the testimony and admonished the jury to disregard it, but "you cannot unring a bell and the jury heard it."

¶ 72 The State responded that it did prepare T.L. and "told her not to volunteer any information about the picture." It noted that the defense asked the question that prompted T.L. to so testify and argued that one could "tell from her demeanor that she was a little bit flustered at that time by the

question" and "that she thought she was just answering the question the way she was supposed to." The Stated noted that the court gave a limiting instruction and argued that "it was a very small comment" where "she didn't really describe in detail what happened with the picture" and that it was part of the narrative and not more prejudicial than the charged conduct.

¶ 73    The court noted that it granted a motion *in limine* to exclude evidence of a picture but found that its order was not intentionally violated, it was a brief answer to a defense question, and the court immediately gave a limiting instruction. Reminding the parties not to raise the subject again in evidence or argument, the court denied a mistrial.

¶ 74                                      2. Miscellaneous

¶ 75    The defense moved for a directed verdict and for a mistrial due to T.L. not making an identification at trial. In arguing the former, counsel argued in part that the "[S]tate hasn't introduced his address. We don't know if he lives in Afghanistan or Chicago." Regarding the latter, counsel argued that he would have adopted a different trial strategy had the State disclosed that T.L. would not identify defendant, which it would have learned in preparing her for trial. The State argued that it would have been misconduct to show T.L. a photograph of defendant for the first time during trial preparation, as there had never been any pretrial identification procedure. The court denied both motions. As to a mistrial, the absence of an in-court identification would help rather than prejudice defendant and there was no reason for the State to believe T.L. would not make one. The court noted that Johanna testified to defendant working as security at the clinic and T.L. testified that her assailant was a security guard at the clinic named Charlie Soto. The court noted that counsel could argue in closing as to weight that T.L. said only Charlie in her interview but testified to the full name Charlie Soto.

¶ 76    Defense counsel informed the court that the defense would rest its case without presenting evidence, and in particular would not be calling defendant's wife Jasmin nor Detective Krok though the defense subpoenaed the latter. The State noted that counsel had mentioned the failure to execute a search warrant in his opening statement. The court noted that the jury would be instructed that opening statements are not evidence, and it held that an unserved warrant could not be raised in closing arguments because such an argument would not be supported by trial evidence or a reasonable inference therefrom.

¶ 77    Following admonishments, defendant personally chose not to testify.

¶ 78                          3. Closing Arguments and Verdicts

¶ 79    The State argued that defendant lured T.L. to his home on the ruse of a playdate when he was "desperate" because J.S. "was no longer available to him" as she would not return to his apartment after he abused her. The State argued that Carter was a heroin addict struggling to address her addiction with treatment and brought T.L. with her to treatment nearly every day "until one day things were very, very different." That contrast from her routine was why T.L. "has such remarkable clarity in remembering that day." After reciting the elements of predatory criminal sexual assault of a child and aggravated criminal sexual abuse, the State argued that it had established both offenses. The former was shown by T.L.'s clear account that defendant put his finger in her anus until it hurt. The latter was shown by T.L.'s account that he put her hand on his penis, which she described "with remarkable clarity." The State argued that there was no reason for defendant to do this but sexual gratification.

¶ 80    While reminding the jury that it was addressing charges regarding what happened to T.L. alone, the State argued that the evidence regarding J.S. was relevant to show defendant's intent,

identity, absence of mistake, and propensity to commit sexual offenses. J.S. described what defendant did to her despite the difficulty in discussing acts she did not want to discuss by a man she did not want to face again.

¶ 81    The State argued that T.L. knew things she would know only if she had been in defendant's apartment and brought into a girl's room, including that he had a dog, that he had daughters even though they were not present, and the girl's clothes and dolls. The State argued that T.L.'s shortcomings in the interview regarding truth and lies arose from "bad questions" about whether a dog was there or whether her age was 2 or 12 instead of 6, which was "a hypothetical question that calls for abstract thought." By contrast, T.L. demonstrated her knowledge of events by correcting Glazer in the interview and offering to draw a picture. The State attributed Carter's reluctance to report the incident to police to her drug addiction and homelessness and noted that Carter eventually overcame that reluctance and went to the police, which led to T.L.'s interview.

¶ 82    Defense counsel argued that T.L. could not identify defendant at trial, which belied the State's argument that her memory was clear. Moreover, she never identified him or gave a description of him around the time of the alleged incident when her memory would be fresher. The identity of T.L,'s assailant was not proven, counsel argued, and there was essentially no investigation here. In her interview, T.L. identified her attacker as Charlie the bodyguard, and Johanna testified that defendant was a security guard at the clinic, but the State did not show how many security guards the clinic had in 2012. T.L. testified that her attacker was Charlie Soto but did not provide a last name in the 2012 interview. Counsel argued that "[s]he was fed it." In the interview, she "made up a lie" about a material matter—that defendant sexually abused his daughters—and did not know the difference between truth and fiction. She also changed her

account concerning whether defendant took her home in a van or car and whether he blindfolded her with a mask or bandanna. Moreover, the State was not presenting that mask, photographs of defendant's apartment, or the like as evidence to corroborate her testimony despite the fact that defendant was not hiding and such evidence could have been obtained. The State also did not present forensic evidence to corroborate T.L.'s account, counsel argued.

¶ 83 Counsel argued that the evidence that Carter agreed for 6-year-old T.L. to go on a playdate with defendant's daughters of 10, 11, and 13 was "absurd." Had defendant asked for a playdate, "a typical mom" would have accompanied her and found out that defendant's daughters were too old to want to play with T.L. Carter was also relevant, counsel argued, because it was her rather than T.L. who reported the alleged incident. However, the State did not present Carter as a witness, and as a homeless heroin addict she would "lie, cheat, and beg, borrow and steal" to support herself and her children. T.L. did not show signs of being traumatized or distraught during her interview or trial testimony, counsel argued, and she was a "pawn" of Carter.

¶ 84 As to J.S. and Johanna, counsel argued that there was bias including J.S.'s resentment that would cause her to implicate defendant rather than be sent back to Illinois from Florida. Counsel noted that Johanna denied threatening to send J.S. back to Illinois while J.S. testified that she so threatened, and argued that one of them was lying. J.S.'s account of being molested while her siblings sat a few feet away was not credible. Also, the evidence showed that Johanna texted with J.S.'s boyfriend on November 13 but then went to the police on December 5, not the next day. Counsel argued that J.S. looked away from defendant when asked what he did to her, which he argued to be a sign that she lied and did not want to face defendant as she lied about him. As to

the obvious question of why two girls would implicate defendant if he was not guilty, counsel argued that defendant's work at the clinic put him among fundamentally disreputable people.

¶ 85    In rebuttal, the State argued that there was no forensic evidence because defendant chose his victims. "We don't choose our victims, we don't choose our witnesses. He does." Defendant chose vulnerable victims and took advantage of his positions of trust. It was reasonable to believe that Carter believed defendant when he told her that T.L. was going on a playdate. While defendant attacked T.L.'s account as "garbage," she swore to tell the truth and faced "the most terrifying experience of her life other than being sexually molested by this defendant." It was not unreasonable or incredible that T.L., unfamiliar with testifying and faced by a room full of people, would not look closely at defendant and identify him several years after the incident. However, she did make an identification when she named her attacker as Charlie, security guard at the clinic, and she did describe him at trial: chubby and balding with glasses. Defendant's ex-wife Johanna established that he worked as a security guard at the clinic.

¶ 86    The State acknowledged that there can be animosity between ex-spouses but argued that Johanna was open about her animosity for defendant, which would be understandable when he molested her daughter J.S., so that it would have been implausible if she did not have animosity towards defendant. J.S. also showed rage and sadness when she saw defendant during her testimony, having not seen him since he molested her. J.S. described defendant's apartment, which meshed with T.L.'s description of the apartment where Charlie molested her. As to that molestation, the State argued that the acts defendant inflicted on T.L. could only have been done for sexual gratification whether or not there was evidence he had an erection.

¶ 87    The State reiterated its argument that the discussion of truth and lies in the interview was abstract and hypothetical beyond the ken of a six-year-old like T.L. Glazer did not ask such questions when she did not work at the Center, and the State argued that the questions are unreliable. T.L. had no reason to lie for Carter, especially at trial after years of not having Carter in her life. It was plausible that defendant would target T.L. when he no longer had J.S. to molest. Defendant tricked T.L. with the ruse of a playdate, but she then tricked him by promising not to tell anyone. "She told because she needed to tell because she knew what had happened to her was wrong. She knew that this game needed to be over," As to why she would say defendant molests his daughters when she never met them, the State argued that she inferred from the facts that he put her in his daughter's clothes and molested her in his daughter's bedroom that he must do the same things to them as to herself.

¶ 88    Following instructions, including the limited-purposes instruction and an instruction to disregard all stricken testimony, the jury found defendant guilty of predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 89                        H. Posttrial Motion and Judgment

¶ 90    Defendant filed a posttrial motion, which the court denied following arguments.

¶ 91    Defendant claimed insufficiency of the evidence. However, while T.L. did not identify defendant at trial, she described her attacker as Charlie Soto, security guard at the clinic Carter attended, who attacked her while she was on a playdate at his home. The court found that the only security guard at the clinic was Charlie Soto and the only other man employed there was a therapist named George. Glazer testified that T.L. identified the offender as "Charlie the bodyguard" and said this happened at his home where she was to have a playdate. Johanna, defendant's ex-wife,

testified that he worked as security at the clinic and that she and he had children including J.S., a daughter born in 1999. J.S. testified that defendant, who she identified at trial, committed acts of sexual conduct upon her in his home. On this evidence, the court refused to set aside the verdicts.

¶ 92    Defendant claimed that preindictment delay prejudiced his trial preparation. He filed a pretrial motion on this issue, which the State responded to and the court denied. In denying the posttrial motion, the court reiterated its conclusion that the record showed no prejudice.

¶ 93    Defendant claimed that a motion *in limine* was violated, which should have resulted in a mistrial. T.L. testified that defendant took a photograph of her, despite the court's pretrial ruling that evidence defendant photographed her would not be admitted because the evidence of that act was not preserved and he was not charged with it. However, defense counsel said he may introduce such evidence to argue that evidence was not preserved, and the court said that he could. Moreover, it was not the State but the defense who elicited on cross-examination that defendant photographed T.L. The court admonished the jury to disregard the testimony, and it concluded in denying the posttrial motion that the admonishment was sufficient to cure any prejudicial effect.

¶ 94    Defendant claimed that the State committed a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)) by failing to disclose that T.L. would not be able to identify defendant in court. However, she reported the incident to Carter the same day and named defendant as her attacker. The court found that defendant was known to both T.L. and Carter. T.L. again named defendant as her attacker in Glazer's interview. Lastly, the court found that defendant at trial still fit T.L.'s description of her attacker: tall, chubby, and balding, with glasses and a beard. Under such circumstances, the court found, the State could not reasonably foresee that T.L. would fail to point out defendant at trial.

¶ 95    Defendant claimed another *Brady* violation by not disclosing Carter's 2016 felony conviction for identity theft. The court noted that defendant took two different positions on this point. On one hand, he argued that his trial strategy would have changed if he knew he could impeach Carter. On the other hand, when the State informed the defense shortly before trial that Carter was in the hospital, counsel stated that the defense was ready to proceed to trial without Carter because counsel did not want to call her as a witness to say that she put T.L. in the car with defendant. The court found no *Brady* violation, finding it to be speculative that the defense could have impeached Carter as a witness if the trial had been earlier. The court noted that the defense was able to use Carter's addiction to challenge her credibility as an outcry witness despite her not testifying at trial.

¶ 96    Defendant claimed that the court erred in denying a pretrial motion for an evidence deposition of Dr. Jackson. The court found that "[t]his was argued fully and the court's reasoning is of record." Similarly, defendant claimed that the court erred in admitting other-crimes evidence and section 115-10 evidence, and the court again noted that it addressed both matters earlier and held that its rulings would stand.

¶ 97    Lastly, defendant claimed that the court lacked jurisdiction because the State never proved in the trial evidence that the offenses occurred in Cook County. In denying the motion, the court found that T.L. testified to living at a specified address on Lawndale Avenue in the Humboldt Park neighborhood, that she and Carter walked to the nearby El Rincon clinic where defendant worked, and that she went to defendant's house, which was in the Humboldt Park neighborhood. T.L. was treated in the emergency room of St. Mary's Hospital on Division Street in Chicago, she was interviewed at the Chicago Children's Advocacy Center, and the Chicago Police Department

conducted the investigation. The court acknowledged that it did not hear the word "Illinois" or the phrase "Cook County" expressly stated in the trial evidence but found that the evidence established that the offenses occurred in Chicago and therefore within the trial court's jurisdiction.

¶ 98    Following a sentencing hearing, the court sentenced defendant to consecutive prison terms of 10 and 4 years. This appeal timely followed.

¶ 99                                  III. ANALYSIS

¶ 100   On appeal, defendant contends that the trial court erred in not dismissing his case for a prejudicial six-year preindictment delay. He also contends that the trial court lacked jurisdiction because the State did not prove at trial that the alleged offenses occurred in Illinois. He contends that the court erred in admitting T.L.'s 2012 interview. He also contends that the court erred in denying his motion for an evidentiary deposition of Dr. Jackson, to whom T.L. denied being abused, and his motion *in limine* to bar T.L. from identifying defendant at trial. He contends that the evidence was insufficient to convict him. He contends that the State failed to disclose Carter's felony conviction and T.L.'s failure to identify defendant. Lastly, he contends that the court erred in denying his motion for a mistrial for T.L. testifying in violation of an order *in limine*.

¶ 101                           A. Preindictment Delay

¶ 102   Defendant contends that the court erred in not dismissing his case when the six-year delay between the alleged offenses and his indictment prejudiced his defense.

¶ 103   Our supreme court has held that the trial court has the authority to dismiss an indictment for denial of due process. *People v. Stapinski*, 2015 IL 118278, ¶ 50. However, "courts must proceed with restraint and ascertain preindictment denial of due process only with certainty. Such certainty may be ascertainable in a pretrial evidentiary hearing on a motion to dismiss" or at trial

as the court sees proper. *People v. Lawson*, 67 Ill. 2d 449, 457 (1977). There is no right to be arrested once an alleged violation has occurred, as a prolonged investigation may necessitate delay, nor does delay before an indictment or arrest raise a speedy trial issue. *Id.* at 457-58.

¶ 104   Instead, dismissal on due process grounds requires a showing of actual and substantial prejudice. *People v. Benitez*, 169 Ill. 2d 245, 256 (1996). "If the accused satisfies the trial court that he or she has been substantially prejudiced by the delay, then the burden shifts to the State to show the reasonableness, if not the necessity, of the delay." *Lawson*, 67 Ill. 2d at 459. If there was substantial prejudice but the delay was reasonable, the court must make a determination based upon balancing the interests of the defendant and the public, considering factors such as the length of the delay and the seriousness of the crime. *Id.*

¶ 105   Generally, the ultimate ruling on a motion to dismiss is reviewed for abuse of discretion while purely legal questions are reviewed *de novo*. *Stapinski*, 2015 IL 118278, ¶ 35. Whether a defendant was denied due process, and whether that denial was sufficiently prejudicial to require dismissal, are questions of law reviewed *de novo*, while the decision on the appropriate remedy for a prejudicial denial of due process is reviewed for abuse of discretion. *Id.*

¶ 106   Here, the trial court found that defendant failed to make a showing of actual and substantial prejudice and thus did not proceed to the further steps of a *Lawson* analysis. We agree that defendant failed to show actual and substantial prejudice from the six-year delay between the alleged offense and investigation in 2012 and the 2018 indictment. The instances of prejudice that he alleged were speculative or insubstantial. Stated another way, we find that defendant has not shown a due process violation with certainty.

¶ 107   The prejudicial effect of not obtaining defendant's 2012 cell phone rests on the assertion regarding T.L.'s allegation that he photographed her vagina that said "allegation could have been easily refuted through a forensic examination of the Defendant's cell phone." As the trial court noted, the failure to obtain the cell phone could have corroborated the allegation so that the State was likely prejudiced by its own delay.

¶ 108   Defendant's claim that T.L.'s father Clint would have corroborated that no playdate was arranged is allegedly rendered substantial by Clint's death certificate and defendant's self-serving affidavit that he made no such arrangement and Clint knew that. It is speculative that finding the clinic employee Carter spoke with in 2012 would have uncovered exculpatory evidence. While the record supports that Carter was unavailable until the eve of trial, police reports in 2012 were already indicating that she could not be found. Moreover, the undoubted troubles in Carter's life cited by defendant are tenuous support for his theory that Carter had T.L. falsely implicate defendant so she could collect damages from the clinic.

¶ 109   We do not look favorably on the passage of six years between these offenses being reported and investigated in 2012 and defendant being arrested and indicted in 2018. Nonetheless, defendant did not show that the delay deprived him of due process. Therefore, we conclude that the trial court did not err in denying his motion to dismiss.

¶ 110                                    B. Jurisdiction

¶ 111   Defendant also contends that the trial court lacked jurisdiction because the State failed to prove at trial that the offenses occurred in Illinois.

¶ 112   A defendant is subject to prosecution in Illinois for a criminal offense if it is "committed either wholly or partly within the State." 720 ILCS 5/1-5(a)(1) (West 2012). Thus, the fact that the

offenses charged took place wholly or partly within Illinois is an essential element that must be proven beyond a reasonable doubt along with the elements of the offenses charged. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 24.

¶ 113   "[I]f the location of the criminal conduct at issue is unclear, it is necessary for the trial court to instruct jurors that they must find that the crime was committed at least partly within the state." *Id.* Conversely, where the location of the offenses is not unclear, the trial court has no obligation to *sua sponte* issue a jury instruction on the issue of geographic jurisdiction. *Id.* The issue of which instructions to give a jury is reviewed for an abuse of discretion. *People v. Gilliam*, 2013 IL App (1st) 113104, ¶ 41.

¶ 114   As with other elements of offenses, the State may satisfy its burden of proving jurisdiction by either direct or circumstantial evidence. *Id.* ¶ 34. "The test applied in an appeal challenging a criminal conviction based on the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Id.* A trier of fact is not required to disregard inferences that flow normally from the evidence nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 70. In other words, the State need not disprove or rule out all possible factual scenarios. *People v. Newton*, 2018 IL 122958, ¶ 27.

¶ 115   Here, as a threshold matter, we find that the court did not err in not *sua sponte* instructing the jury on geographic jurisdiction. Looking only at trial evidence, it was not unclear to the trial court, nor is it unclear to us, that defendant committed these offenses in Chicago.

¶ 116 As the trial court noted, the allegations were investigated by the Chicago Police Department and the Chicago Children's Advocacy Center working with the Cook County State's Attorney's Office. While defendant's address was never given at trial, T.L. and Johanna placed defendant's home on a street named Tripp, near but not in Humboldt Park, and the testimony of J.S. and Johanna was filled with references to J.S. not returning to Chicago or Illinois where defendant molested her in his home in 2011.

¶ 117 On the same evidence, taken in the light most favorable to the State as we must, a rational trier of fact could infer from the circumstantial evidence that defendant committed these offenses in Chicago and thus in Illinois. We need not elevate to reasonable doubt the possibilities that Chicago police were investigating crimes outside Illinois, that defendant's home was on a street named Tripp near a Humboldt Park in a state other than Illinois, or that he lived in Chicago when he molested J.S. in his home in 2011 but lived outside Illinois when he assaulted T.L. in his home in 2012.

¶ 118                    C. Admission of T.L.'s Interview

¶ 119 Defendant contends that the court erred by admitting T.L.'s 2012 interview.

¶ 120 "In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13," for various offenses including the offenses charged herein, the court may admit into evidence as an exception to the hearsay rule:

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an

offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a) (West 2012).

The evidence is admissible only if (1) the child testifies at trial, or is unavailable to testify and the alleged act is corroborated, and (2) the "court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b).

¶ 121    "The purpose of this hearsay exception is to alleviate concerns that at trial very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse or might be psychologically impeded from doing so." *People v. Foster*, 2020 IL App (2d) 170683, ¶ 28. In conducting a reliability determination, the court evaluates the totality of the circumstances surrounding the making of the statements in question. *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 242. Important factors in determining whether the time, content, and circumstances of statements provide sufficient safeguards of reliability include the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of similar age, and the lack of motive to fabricate. *Id.* ¶ 247. Where the State intends to call the child as a witness, it need not present corroborative evidence at a section 115-10 hearing. *People v. Embry*, 249 Ill. App. 3d 750, 760-61 (1993).

¶ 122    Because a child may understandably be reluctant to be candid about a traumatic experience, asking a child questions is not inherently coercive or suggestive. *Burgund*, 2016 IL App (5th) 130119, ¶¶ 250-51. Similarly, a delay in reporting abuse or initial denials of abuse will not automatically render a child's statements inadmissible. *Id.* ¶ 253. The State bears the burden of establishing that statements did not result from adult prompting or manipulation. *Id.* ¶ 247. The

trial court has considerable discretion in determining the admissibility of statements under section 115-10, and this court will not reverse that determination absent an abuse of discretion. *Id.* ¶ 242.

¶ 123   Here, we cannot conclude that the trial court abused its discretion in admitting T.L.'s interview. As a threshold matter, the State intended to call T.L. as a trial witness and actually did so. The key question under section 115-10 is thus whether the time, content, and circumstances of the interview provides sufficient safeguards of reliability. We cannot conclude that the trial court abused its discretion in finding sufficient safeguards. T.L. was interviewed about a week after the incident. Almost immediately after Glazer began the interview, T.L. described spontaneously what defendant did to her. She corrected Glazer when Glazer misspoke, and Glazer was not leading her. T.L. was generally forthcoming and responsive but also under a modicum of stress as shown by her requests to suspend the interview due to a headache and for a drink for her dry throat. That stress is understandable given the traumatic experiences she was discussing.

¶ 124   As to motives to lie, the court was not required to weigh Carter's motivations or life issues as heavily as the defense proposed in assessing T.L's credibility or reliability in the interview. Carter did not participate in or even observe the interview. As to T.L.'s own relationship with truth, the court was not obligated to accept the defense proposition that she could not tell the difference between truth and lies. Asking a 6-year-old if it would be true to say she was 2 or 12, or asking if it was true if an adult told her that a dog was in a chair when it was not, were arguably confusing to such a young child and not as indicative as the defense claims, as Glazer notably opined at trial. More significant was T.L.'s brief assertion that defendant abused his daughters despite T.L. not meeting them. However, given that she was molested in defendant's home in a girl's bedroom

while wearing defendant's daughter's clothes at his behest, it is as likely that T.L. was voicing her earnest inference or concern as that she lied.

¶ 125   We cannot find that the court abused its discretion in concluding, after viewing the interview as a whole, that there was sufficient safeguard of reliability in the interview to admit it under section 115-10 and let any issues with T.L.'s credibility be raised at trial before the trier of fact as matters concerning the weight of the evidence.

¶ 126                        D. Deposition Ruling

¶ 127   Defendant contends that the court erred in denying his motion for an evidentiary deposition of Dr. Jackson, to whom T.L. denied being abused.

¶ 128   Illinois Supreme Court Rule 414(a) (eff. Oct. 1, 1971) provides for evidentiary depositions in criminal cases "[i]f it appears to the court *** that the deposition of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of hearing or trial." "The deposition is not taken by right but is subject to court approval." Ill. S. Ct. R. 414, Committee Comments (adopted Oct. 1, 1971). The movant must provide the court with evidence that the deposition is necessary. *People v. Weinke*, 2016 IL App (1st) 141196, ¶ 40. The court will "determine the reliability, accuracy, and credibility of the representations made in support of the" deposition motion. *Id.* ¶ 37. Whether a witness is unavailable for purposes of Rule 414 is addressed to the trial court's discretion and reviewed for an abuse of discretion. *People v. Lewis*, 2021 IL App (3d) 180259, ¶ 23.

¶ 129   Here, we find that the trial court did not abuse its discretion in denying defendant an evidentiary deposition of Dr. Jackson. It was reasonable for the court to assess defendant's motion, including its attachment, and conclude from the time and circumstances of Dr. Jackson's

examination of T.L. that the notation "child denies abuse" is not the impeachment of T.L.'s interview or trial testimony that defendant argues it to be. Dr. Jackson was examining T.L. over two months after the incident "with DCFS worker and forster [*sic*] mom for medical clearance," not further investigation of the incident. It is reasonable to infer from this context that the remark was to the effect that T.L. denied *being* abused around the time of the examination by Carter or her foster parent, rather than a sweeping statement that she was *never* abused at any time by anyone. That conclusion being reasonable, it was also reasonable for the court to deny an evidentiary deposition of Dr. Jackson as unlikely to produce relevant evidence and thus not necessary to preserve relevant evidence under Rule 414.

¶ 130                    E. Motion to Bar T.L.'s Identification

¶ 131    Defendant contends that the trial court erred in denying his motion *in limine* to bar T.L. from making an identification of defendant at trial. However, defendant cites no case for the proposition that a witness should be barred from making an identification at trial merely because he or she did not make a pretrial identification or give a pretrial description. He cites the factors for evaluating a witness identification including prior identifications. See, *e.g.*, *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). However, it does not follow solely from citing the factors used to *weigh* an identification that a witness should be *barred* outright from making a trial identification, especially when the court was considering not a potentially biased pretrial identification procedure but a case with no pretrial identification procedure at all. Moreover, as the State argues in response, any error in allowing T.L. the opportunity to make an identification was harmless beyond a reasonable doubt to the defense because she could not make one.

¶ 132                          F. Sufficiency of the Evidence

¶ 133   Defendant contends that the evidence was insufficient to convict him.

¶ 134   In 2012, a person committed predatory criminal sexual assault of a child by committing an act of sexual penetration when he or she was 17 years of age or older and the victim was under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2012). "Sexual penetration" was defined as:

> "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." *Id.* § 11-0.1.

¶ 135   In 2012, a person committed aggravated criminal sexual abuse when he or she was "17 years of age or over and *** commit[ted] an act of sexual conduct with a victim who [was] under 13 years of age" when the act was committed. *Id.* § 11-1.60(c)(1)(i). "Sexual conduct" was:

> "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1.

Sexual gratification may be proven with circumstantial evidence, including sexually explicit remarks, the removal of clothing, heavy breathing, placing the victim's hand on the defendant's genitals, an erection, or other observable signs of arousal. *In re M.H.*, 2019 IL App (3d) 180625, ¶ 17; *People v. Holmes*, 2018 IL App (3d) 160060, ¶ 20.

¶ 136   When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 64. That standard applies to both direct and circumstantial evidence, and a conviction may stand on sufficient circumstantial evidence. *Id.* Intent, knowledge, and other mental states may be proven circumstantially and inferred by the trier of fact. *People v. Eubanks*, 2019 IL 123525, ¶ 74. Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *Id.* ¶ 95. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence. *Jackson*, 2020 IL 124112, ¶ 64. We do not retry a defendant or substitute our judgment for that of the trier of fact regarding witness credibility or the weight of evidence. *Id.* The trier of fact may consider the evidence in light of his or her knowledge and observations in the affairs of life. *Newton*, 2018 IL 122958, ¶ 28.

¶ 137   The testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted. *People v. Harris*, 2018 IL 121932, ¶ 27. "[C]ontradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully" because the trier of fact must decide how flaws in portions of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47.

¶ 138   A trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 70. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27. A trier of fact need not be satisfied

beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.* ¶ 64.

¶ 139    Here, taking the evidence in the light most favorable to the State as we must, we find that a reasonable trier of fact could find defendant guilty of the predatory criminal sexual assault and aggravated criminal sexual abuse of T.L. She testified that, when she was six years old, a clinic security guard named Charlie Soto brought her to his home on the pretext of a playdate but instead had her play a guessing game in which she was blindfolded and had to guess what she was touching, and then guided her right hand towards himself and she touched something. When she was interviewed around the time of the incident, she said that the thing Charlie had her touch was his "goobey gun," which she clarified to be his penis, and that she had heard a zipper before he made her touch it. She testified at trial, and stated in 2012, that Charlie next put his finger in her anus until it hurt. While she did not identify her attacker, she described him at trial, and the trial court found in denying the posttrial motion that defendant still fit that description. Johanna, defendant's ex-wife, testified that defendant Charlie Soto was a security guard at the clinic.

¶ 140    J.S., daughter of Johanna and defendant, testified that defendant, who she identified in court, molested her in his home when she was 11 years old. J.S.'s testimony showed defendant's propensity to commit sexual acts with preteen girls, corroborated T.L.'s account that Charlie Soto did so in his own home when no other adults were present and addressed identity by reducing the already slim prospect that the Charlie Soto whom T.L. named as her attacker was not defendant.

¶ 141 On such evidence, taken in the light most favorable to the State, the conclusion that defendant committed an act of sexual penetration and an act of sexual conduct with T.L. when he was at least 17 years of age and she was under 13 years of age (720 ILCS 5/11-1.40(a)(1), 11-1.60(c)(1)(i) (West 2012)) is not so unreasonable or improbable as to leave reasonable doubt of his guilt. In other words, we conclude that a reasonable trier of fact could find defendant guilty.

¶ 142 We need not elevate the points raised by defendant to reasonable doubt. As noted, T.L. named clinic security guard Charlie Soto as her assailant, and Johanna testified that defendant was a clinic security guard. The State was not required to eliminate, and we need not elevate to reasonable doubt, the possibility that the clinic had another security guard or that defendant was not a guard there in 2012. Also, the State was not required to eliminate, and we need not elevate to reasonable doubt, the possibility that Charlie was tall, chubby, and balding with glasses in 2012 as T.L. testified, and defendant fit that description at trial, but defendant was significantly different from that description in August 2012.

¶ 143 More generally, we need not elevate to reasonable doubt the fact that there are discrepancies between T.L.'s 2012 interview and her trial testimony, such as not giving defendant's last name and not describing the wallpaper in the bedroom in 2012 while testifying to both or describing defendant's vehicle as a car in 2012 and a van at trial. Over seven years passed between her interview and testimony, and recalling details at trial that she may not have been asked about in 2012, or forgetting details at trial that she knew in 2012, does not render her generally consistent accounts implausible. While there was some basis for questioning T.L.'s understanding of truth and lies when she was six in 2012, a reasonable trier of fact could nonetheless find her

statement then and her testimony at trial to be sufficiently reliable—especially in light of the other evidence including J.S.'s account—to accept the key portions of her account.

¶ 144    Lastly, as to the motives of witnesses to falsely implicate defendant, those motives were placed before the trier of fact and weighed in reaching its verdict. Carter was a homeless drug addict with six-year-old T.L. in her care when T.L. reported being assaulted and was interviewed about it. However, T.L. was out of Carter's care, and indeed had no relationship with her, for over seven years when she testified. Johanna and J.S. had reasons to resent defendant such as Johanna's divorce and J.S.'s resentment of defendant's treatment of his stepdaughter, and J.S. did not want to be returned to Chicago. However, Johanna and J.S. could also have resented defendant for molesting J.S. as she testified. None of these factors renders defendant's guilt so improbable or unsatisfactory that we have any reasonable doubt remaining.

¶ 145                                          G. *Brady*

¶ 146    Defendant contends that the State violated *Brady* by failing to disclose Carter's 2016 felony conviction and T.L.'s failure to identify defendant.

¶ 147    *Brady* requires the State to disclose evidence that is favorable to the accused and material to either guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). This includes evidence known to police but not to the prosecutor, as a prosecutor has a duty to learn of favorable evidence known to other government actors. *Id.* A *Brady* claim requires showing that (1) the undisclosed evidence is favorable to the defendant because it is exculpatory or impeaching, (2) the evidence was suppressed by the State either willfully or inadvertently, and (3) the defendant was prejudiced because the evidence is material to guilt or punishment. *Id.* at 73-74. Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the

evidence been disclosed; that is, the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Id.* at 74. In determining materiality, a court must consider the cumulative effect of all the suppressed evidence rather than considering each item of evidence individually. *Id.*

¶ 148 Here, we agree with the trial court that the State did not know and could not reasonably foresee that T.L. would not make an identification at trial. She made no pretrial identification of defendant, but she was never asked to make an identification from a photographic array or lineup. Unlike a case where a witness views an array or lineup and fails to make an identification, this was not a case where the police knew something exculpatory or impeaching and the State was obligated to learn it. The State told the court that it did not and could not show T.L. a photograph of defendant for the first time in preparing her for trial. If the State did not know she would not identify defendant until it occurred in open court, it could not have suppressed that fact even inadvertently.

¶ 149 Turning to materiality of the allegedly suppressed evidence, we find no reasonable probability that the proceedings would have been different had it been disclosed. The jury indeed saw that T.L. could not *identify* defendant when given the opportunity at trial. However, she *named* defendant—one-time clinic security guard Charlie Soto—as the man who attacked her. She also gave a description of her assailant that the jury could compare to defendant seated before it and which the court found defendant still resembled. We do not see how defense counsel knowing T.L. would fail to identify defendant in court before she did so would place the proceedings in such a different light as to undermine our confidence in the verdict.

¶ 150 As to the materiality of Carter's 2016 felony conviction for identity theft, the defense had ample opportunity to impeach Carter's motive for reporting defendant's actions towards T.L. with

her drug addiction. Moreover, the influence Carter may have had over T.L. when she was six years old strikes us as immaterial when T.L. reiterated her allegations at trial over seven years later. By then, Carter had no influence over T.L. as she had not been raising her or even had a relationship with her since 2012. We do not see how adding Carter's felony conviction to the trial evidence and arguments would place the proceedings in such a different light as to undermine our confidence in the verdict.

¶ 151                                    H. Mistrial

¶ 152   Lastly, defendant contends that the court erred in denying his motion for a mistrial for T.L. testifying in violation of an order *in limine*.

¶ 153   A mistrial should be declared only if there is an occurrence of such character and magnitude as to deprive a party of a fair trial and that party demonstrates actual prejudice. *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 117. Whether to grant a mistrial is within the broad discretion of the trial court based on the particular circumstances of the case and will be reversed only for a clear abuse of discretion. *Id.*

¶ 154   Here, we cannot conclude that the trial court abused its discretion in denying defendant a mistrial based on T.L.'s response: "When I was sitting on the bedroom that is when he took a picture of my front part and then he put—so—he told me that—I'm sorry, can you repeat the question?" Firstly, she did not mention her vagina by that word or any readily recognizable euphemism but instead used the ambiguous term "front part." The prejudice from this brief and vague remark is not clear to us. Nor, indeed, was it immediately apparent to defense counsel, who began to reframe his question rather than objecting to the remark.

¶ 155   Secondly, it is reasonable to find the violation of the order *in limine* to have been inadvertent. The State did not elicit this testimony, the court could reasonably accept the State's representation that it admonished T.L. regarding the excluded evidence before her testimony, and it could reasonably conclude that she was flustered when she gave this response rather than contriving to give barred testimony.

¶ 156   Lastly, the court *sua sponte* struck the response and instructed the jury to disregard it, and the response was not mentioned in closing arguments. While the defense argues that a bell cannot be unrung, we find this to be a bell that barely tinkled, did so because defense counsel accidentally bumped it, and was promptly muffled by the trial court. The court did not err in denying a mistrial under such circumstances.

¶ 157                                          IV. CONCLUSION

¶ 158   Accordingly, the judgment of the circuit court is affirmed.

¶ 159   Affirmed.

_____

**No. 1-20-1208**

_____

| | |
|---|---|
| **Cite as:** | *People v. Soto*, 2022 IL App (1st) 201208 |

_____

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-16490; the Hon. Angela Munari Petrone, Judge, presiding. |

_____

| | |
|---|---|
| **Attorneys for Appellant:** | Saul M. Ferris, of Ferris, Thompson & Zweig, Ltd., of Gurnee, for appellant. |

_____

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Enrique Abraham, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |

_____