2025 IL App (2d) 240261-U
No. 2-24-0261
Order filed January 15, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-840 |
| DAVID R. AREVALO-ESTRADA, | ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Admission of the child victim's prior hearsay statements describing defendant's sex offenses against her was not error where the statements had sufficient safeguards of reliability. (2) Sufficient evidence supported defendant's convictions of predatory criminal sexual assault of a child.

¶ 2    After a bench trial in the circuit court of Kane County, defendant, David R. Arevalo-Estrada, was convicted of several sex offenses. The offenses merged into two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). Defendant argues on appeal that (1) the trial court erred in admitting hearsay statements from the victim and (2) the State failed to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      A Kane County grand jury returned a 16-count indictment against defendant. The alleged victim in all counts was A.C., defendant's daughter. The indictment charged defendant with four counts of predatory criminal sexual assault of a child based on allegations that he placed his sex organ on A.C.'s hand (counts I, III, and IV) and placed his hand on A.C.'s sex organ (count II). The indictment further charged defendant with 12 counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), alleging that he touched A.C.'s sex organ (counts V and IX), placed his sex organ on her sex organ (count VI), placed his hand on her buttocks (counts VII, VIII, XV, and XVI), placed his sex organ on A.C.'s hand (counts X and XII), placed his body on A.C.'s body (counts XI and XIII), and placed his mouth on A.C.'s mouth (count XIV). Each count alleged that defendant committed the offense when he was 17 years of age or older and A.C. was under the age of 13 and that he acted for the purpose of his or A.C.'s sexual gratification or arousal. The counts alleged the following date ranges for the conduct: August 1, 2014, through August 1, 2016 (counts I, II, III, IV, XIII, XIV, and XV); August 1, 2013, through August 1, 2016 (counts V, VI, VII, VIII, IX, X, XI, XII); and April 1, 2019, through April 24, 2019 (count XVI).

¶ 5      Before trial, the State filed a pretrial motion under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)) to admit hearsay statements by A.C. The State also filed a motion under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2020)) and Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) to admit " 'other sex-crimes evidence,' " namely defendant's (1) uncharged sex offenses against A.C. and (2) his sexual misconduct toward L.R., who is A.C.'s aunt.

¶ 6      The trial court heard the section 115-10 motion first. At the hearing, Christine Kral testified that, on April 24, 2019, she was A.C.'s fifth grade teacher. On that date, she noticed that A.C., "a

pretty bubbly kid," "was acting really sad and had her hood up and was all curled up in a ball and was clearly acting like something was wrong." Kral took A.C. into the hallway and asked her if something was wrong. A.C. was crying. She said that defendant had touched her "private areas." A.C. "gestured to her lower area." She also told Kral that defendant had made her touch his private areas. Kral then took A.C. to the school social worker and called the Department of Children and Family Services. A.C. was 10 or 11 when she made her allegation.

¶ 7 A.C.'s maternal grandmother, M.R., testified that, on April 22, 2019, she lived in Montgomery with her husband, son, daughter L.R., and several of her grandchildren, including A.C. On that date, A.C. constantly called her at work to ask when she was coming home. A.C. indicated that she needed to talk to M.R. When M.R. arrived home, A.C. was at the door waiting for her. A.C. wanted to talk to M.R. in L.R.'s room. L.R. was present for the conversation. M.R. testified, "[A.C.] was *** on [L.R.'s] bed holding a pillow and keep [*sic*] telling me about what happened to her with her father, that her father was touching her." M.R. explained that, as a certified nursing assistant, she was a mandatory reporter and was trained not to question a victim of abuse, but to let the victim give his or her own account. So, M.R. let A.C. continue talking. According to M.R., A.C. "said that [defendant] had been touching her on—in areas that he should not be touching, that he had been touching her inappropriately. He was touching her privates." A.C. told M.R. that it happened more than once. A.C. did not say, and M.R. did not ask, where the abuse took place or during what time frame. According to M.R., A.C. said she "didn't want to go with [defendant] no more *** because he had been doing things that he should not be doing." A.C. was very nervous. She was hugging a pillow and crying.

¶ 8 At some point, M.R. left A.C. and L.R. in L.R.'s bedroom. M.R. went to her bedroom, told her husband what had happened, and contacted the police. She then called her daughter, M.A.,

who was A.C.'s mother. In April 2019, M.A. was not living with M.R., but A.C. lived there because M.R. had custody of A.C.

¶ 9    L.R. testified that she was 17 at the time of the hearing. On April 22, 2019, she lived in Montgomery with M.R. and A.C. On that date, A.C. came home from school and asked for M.R. A.C. said that she really needed to talk to M.R. L.R. tried to ask A.C. what was wrong, but A.C. said she needed both L.R. and M.R. there and "couldn't explain it over the phone." L.R. called M.R. and told her that she needed to come home. When M.R. arrived, A.C. was in the bedroom she shared with L.R. A.C. was sitting on the edge of the bed and holding a pillow. A.C. said that defendant had touched her "private parts." For a while, he had stopped doing it, "but the more [A.C.] started going over there to [defendant's], he became more towards doing that again." A.C. was "scared that it was going to happen." A.C. said that defendant had touched the "lower region" of her body; she specifically mentioned her "butt." A.C. said that the inappropriate touching had occurred at (1) the house in Aurora where A.C. had previously lived with M.A. and defendant and (2) the house where defendant was living with his parents. L.R. testified that, after A.C. made her allegation, the police were called. M.A., who was L.R.'s sister, also arrived.

¶ 10    M.A. testified that A.C. was born on June 8, 2008. On April 22, 2019, M.R. called M.A. at work and told her that she needed to come to M.R.'s house. When M.A. arrived, the police were there. After speaking with the police, M.A. went into A.C.'s room and asked her what was wrong. A.C. responded that she did not want to go to defendant's house anymore. According to M.A., A.C. said, "Daddy made me do things to him." A.C. said that defendant had "made her touch him in his private parts." No one else was present for this conversation. A.C. told M.A. that the abuse occurred when M.A., A.C., and defendant were previously living in M.R.'s home. A.C. did not mention any abuse occurring at the house in Aurora or defendant's mother's home.

¶ 11    In addition to the testimony at the hearing, the court viewed a video recording of an interview of A.C. conducted on April 25, 2019, by Beth Mullarkey, an investigator with the Kane County Child Advocacy Center (CAC).  During the interview, A.C. recalled that defendant "ma[de] [her] touch him" from when she was in kindergarten until she was in second grade.  He would make her touch his "private."   When A.C. and her family lived with M.R. in her Montgomery home, defendant made her touch him in the guest bedroom where defendant and M.A. slept.  Later, when A.C. and her family moved to the house in Aurora, defendant made her touch him in the living room.  M.A. was upstairs during some of these incidents.  When defendant made her touch him, he made her go under his clothes.  Defendant would make A.C. "grab it, like hold it and move it around."  Defendant "sometimes *** tried to kiss [her] all the time."  He also "humped" her.  She explained that defendant would throw her on the bed, get on top of her, and kiss her.  When defendant was watching television or playing video games, he would make A.C. sit next to him and make her touch him.  The last time defendant made A.C. touch him was when she was in second grade.  A.C. stated that defendant tried to pay her to keep her quiet.

¶ 12    When Mullarkey asked "how many times it happened" when A.C. was in kindergarten, she answered that defendant did not "do that much to [her]" when she was in kindergarten.  Defendant "started to do more" when she was in first grade. Specifically, defendant made her "squeeze it" and he "humped" her.  A.C. described the "humping" similarly to how she described it earlier in the interview.  After the "humping," defendant would kiss her and make her touch him.  This happened "mostly every day" when she was in first grade.  When she was in second grade, defendant "only made [her] touch him."  "It started to end" toward Christmas when she was in second grade.

¶ 13    When Mullarkey asked A.C. if defendant ever touched her in a way that made her uncomfortable, A.C. said that he sometimes touched her "private" or her butt. She remembered one time "clearly": while giving A.C. and her siblings a shower, defendant touched her naked "private part" and butt. She recalled another time when defendant, while naked, made her hug him and then rubbed his "thing" on her "private." She could not remember how many other times defendant touched her. Later in the interview, she clarified that the shower incident was the only time he touched her when she was naked. She then recalled times when defendant "grabbed" and "squeezed" her butt; sometimes he did this over her clothes and sometimes over her underwear. A.C. recalled that, the Sunday before the interview, defendant touched her "back private."

¶ 14    The trial court ruled, in a written order, that A.C.'s out-of-court statements to Kral, M.R., L.R., M.A., and Mullarkey were admissible under section 115-10. The court noted that A.C.'s statements to Mullarkey were more detailed than her statements to the witnesses "as to when these inappropriate acts took place, where the inappropriate acts took place, and how often these inappropriate acts by [defendant] occurred." Nonetheless, the statements to Mullarkey were consistent with the other statements, and the additional detail did not indicate unreliability. The court further determined that Mullarkey's questions to A.C. were not unduly suggestive and that A.C. had no motive to fabricate her allegations.

¶ 15    Subsequently, the trial court heard the State's motion under section 115-7.3 and Rule 404(b). The court, in its written order, granted the motion in part and denied it in part. The court noted that all the evidence the State sought to admit as to defendant's conduct toward A.C. was already admitted under section 115-10. The court reversed that prior ruling only as to A.C.'s statement to Mullarkey that defendant offered to pay A.C. not to disclose what he did to her. The

court also barred the State from presenting evidence of defendant's sexual misconduct toward L.R., which she described in an interview with investigators.

¶ 16    At trial, A.C. testified that she was born on June 8, 2008, and had just turned 15. She lived with M.R. in her Montgomery home. A.C. had not seen defendant since May 2019. Starting when A.C. was about five, defendant would grab her hand and put it underneath his underwear. Her hand would touch his penis. At that time, she lived with her parents and siblings in M.R.'s Montgomery home. The abuse always occurred in the guest bedroom, which her parents were using. Sometimes, while both were clothed, defendant would rub her private part against his. Defendant did this by pushing her body against his. When A.C. was six, she moved to Aurora with her parents and siblings. In the living room of the Aurora home, defendant would put her hand under his clothes and on his penis. A.C. testified that, when defendant bathed her and her siblings together, defendant "would spend a lot of time washing [her] butt" and would sometimes touch her "front area" (which she described as what she uses for peeing) with his hand. Defendant kissed A.C. on the lips both when they lived in Montgomery and when they lived in Aurora. This occurred more than once at each location, usually before or after her hand was in his pants.

¶ 17    In her testimony, Kral recounted the brief conversation in which A.R. revealed that defendant had been touching her "private areas."

¶ 18    M.R. testified that, on April 22, 2019, she received several phone calls from A.C., who wanted M.R. to come home and wanted to know when she would be there. When M.R. arrived, A.C. took her to the room she shared with L.R., who was in the room. A.C. sat on the bed, holding a pillow. M.R. asked what was wrong, and A.C. said that defendant had been touching her inappropriately. M.R. simply let A.C. talk; as a mandatory reporter, M.R. believed that she should not ask any follow-up questions. A.C. was crying as she held the pillow. M.R. told her husband

what happened and called the police. M.R. testified that she also called M.A., but M.A. was already on her way.

¶ 19 L.R. testified that she lived in Montgomery with her parents and several nephews and nieces, including A.C. On April 22, 2019, when A.C. arrived home, she went into the room she shared with L.R. and said that she needed M.R. to come home immediately. A.C. did not explain why. L.R. called M.R. When M.R. arrived home, L.R. took her into her room. A.C. was on the side of the bed, holding a pillow. She seemed nervous and "scared to *** say anything." A.C. told M.R. and L.R. that defendant had been touching her inappropriately on "her private area, her genitalia." A.C. said that this occurred at her former address in Aurora and initially stopped when A.C. moved to Montgomery. However, A.C. said that the abuse was starting again on visits with defendant, and she was scared. L.R. testified that she called M.A. and told her that she needed to come to M.R.'s home. L.R. did not recall whether she told M.A. anything else.

¶ 20 M.A. testified that defendant was her former husband. On April 22, 2019, M.A. received a phone call from M.R. telling her that she needed to go to M.R.'s home because of an emergency involving A.C. and defendant. When M.A. arrived, police officers were present. M.A. spoke privately with A.C., who said that defendant had made her touch his "private parts." A.C. was crying, "stressed out," and overwhelmed. A.C. said she did not want to "go back to see [defendant]."

¶ 21 On cross-examination, M.A. testified that she was 15 when A.C. was born. When A.C. was almost two, M.A. and A.C. moved in with defendant and his mother. About a year later, M.A. married defendant and they moved with A.C. to M.R.'s home in Montgomery. Later, M.A. and defendant moved to Aurora with A.C. and her siblings. In 2018, M.A. and her children moved out of the Aurora home. At some point, defendant moved in with his mother and M.A. moved back

into the Aurora home. Before April 22, 2019, M.A. was unaware of any abuse, but she recalled an occasion when A.C., who was then five or six, was crying because she did not want to go with defendant.

¶ 22    Mullarkey testified about her training and the process for interviewing suspected child sex abuse victims. She noted that her practice is to ask nonleading questions when interviewing these children. Mullarky acknowledged that she conducted a video-recorded interview of A.C. on April 25, 2019. The recording of the interview was admitted into evidence and played in court.

¶ 23    B.M. testified that she is defendant's mother. Defendant, M.A., and their children lived with B.M. at her apartment for several months in 2012. B.M. last saw A.C. on April 21, 2019, B.M.'s birthday. B.M. did not notice anything unusual about A.C. A.C. did not exhibit any fear of defendant.

¶ 24    Defendant testified that he and M.A. were in high school when A.C. was born. At the time, defendant lived with B.M. while M.A. and A.C. lived with M.R. In 2012, defendant, M.A., and their children moved in with B.M. In 2013, they moved to M.R.'s Montgomery home, where they lived for about two years. Defendant worked six days a week for a company that located underground utilities. In 2015, defendant, M.A., and their children moved to a house in Aurora. Asked whether he helped raise the children, defendant responded that he occasionally helped with the children's dinner but that "usually [he] was always at work." Defendant bathed the children "maybe less than a handful" of times. The children bathed together.

¶ 25    According to defendant, he and M.A. separated in 2018. M.A. moved out of the Aurora house and moved in with her new boyfriend. Defendant denied that he ever touched A.C. in the manner she described. When defendant, M.A., and their children lived with M.R. in Montgomery,

the house was filled with adults and children. Everyone was home when defendant returned from work.

¶ 26 The trial court found defendant guilty of counts I, III, X, and XII and not guilty of the remaining counts. In its order, the court noted discrepancies in the evidence and how they impacted what the court chose to consider. First, the court noted that M.A.'s trial testimony differed from her testimony at the section 115-10 hearing. The court explained:

"[M.A.] testified at the trial and at the [section] 115-10 hearing that [A.C.] told her that the defendant made her touch his private part. At the [section] 115-10 hearing, [M.A.] also testified that [A.C.] told her where this had happened. This testimony was not elicited during the trial, so the Court is not going to consider those statements in coming to this verdict [*sic*]. I will consider that [A.C.] told [M.A.] that the defendant had made her touch his private part but not where it occurred."

¶ 27 Second, the court noted that "[L.R.] and [M.R.] testified, both at the [section] 115-10 hearing and at this trial, to hearing [A.C.] saying different things." The court stated that it would not consider A.C.'s statements to either L.R. or M.R.

¶ 28 Moving to its findings on individual counts, the trial court found credible A.C.'s testimony about the abuse (hand-to-penis contact) that took place in the guest room of M.R.'s home. The court likewise credited A.C.'s testimony that, on more than one occasion, similar abuse took place in the Aurora home. Accordingly, the court found defendant guilty of counts I and III (predatory criminal sexual assault of a child) and counts X and XII (aggravated criminal sexual abuse), which were all based on allegations that defendant placed his sex organ on A.C.'s hand for the purpose of his or her sexual gratification or arousal.

¶ 29    Like counts I and III, count IV charged defendant with committing predatory criminal sexual assault of a child by placing his sex organ on A.C.'s hand for his or her sexual gratification or arousal. However, the court found defendant not guilty of count IV because the evidence presented at trial did not support a third conviction of predatory criminal sexual assault of a child under the theory of hand-to-penis contact.

¶ 30    The court found defendant not guilty of count II (predatory criminal sexual assault of a child) and counts V and IX (aggravated criminal sexual abuse). Counts II, V, and IX alleged that defendant placed his hand on A.C.'s sex organ for sexual gratification or arousal. The court reasoned that the pertinent evidence—that defendant touched A.C.'s "front private part" while washing or bathing her—failed to establish beyond a reasonable doubt that he did so for sexual gratification or arousal.

¶ 31    The trial court also found defendant not guilty of counts VII, VIII, and XV, all of which charged defendant with committing aggravated criminal sexual abuse by placing his hand on A.C.'s buttocks for sexual gratification or arousal. The court concluded that, because the allegations pertained to defendant's conduct while bathing A.C., the evidence was insufficient to prove beyond a reasonable doubt that defendant acted for sexual gratification or arousal.

¶ 32    Counts VI, XI, and XIII, charged aggravated criminal sexual abuse based on allegations that defendant placed his sex organ on A.C.'s sex organ, or placed his body on her body, for sexual gratification or arousal. The court noted that the conduct underlying those charges was "defendant and [A.C.] being face-to-face with their bodies on top of each other while each [was] fully clothed and with each of their respective sex organs being contacted while [they were] wearing clothes, while their bodies [were] rocking against each other." The court found that the conduct could reasonably be characterized as wrestling or hugging and that the State therefore failed to prove

beyond a reasonable doubt that defendant acted for sexual gratification or arousal. Accordingly, the court found defendant not guilty of those charges.

¶ 33 Count XIV alleged that defendant committed aggravated sexual abuse by placing his mouth on A.C.'s mouth for sexual gratification or arousal. The trial court found defendant not guilty of that charge because the evidence that defendant kissed A.C. on the mouth did not establish that he did so for sexual gratification or arousal. Finally, the court found defendant not guilty of count XVI, which charged defendant with committing aggravated criminal sexual abuse by placing his hand on A.C.'s buttocks for sexual gratification or arousal. The court noted that the only evidence supporting this charge was A.C.'s statement to Mullarkey that defendant, on the Sunday before the interview, touched her "back private." The court found that A.C. did not provide enough detail about the incident to prove beyond a reasonable doubt that defendant acted for his or A.C.'s sexual gratification or arousal.

¶ 34 Defendant filed a posttrial motion. The trial court denied the motion, and the matter proceeded to sentencing. The court found that counts X and XII (aggravated criminal sexual abuse) merged into counts I and III (predatory criminal sexual assault of a child). The court imposed consecutive seven-year prison terms on counts I and III. This appeal followed.

¶ 35                                    II. ANALYSIS

¶ 36 Defendant's first argument on appeal is that the trial court erred in admitting A.C.'s hearsay statements under section 115-10 of the Code (725 ILCS 5/115-10 (West 2022)), which creates a hearsay rule exception for statements by child victims in prosecutions for, *inter alia*, sex offenses. That section provides for admission, in certain circumstances, of testimony of an out-of-court statement by the child victim "describing any complaint of [the illegal act charged] or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution

for a sexual or physical act against that victim." *Id.* § 115-10(a)(2). As pertinent here, such testimony is admissible only if "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability[.]" *Id.* § 115-10(b)(1).

¶ 37 Defendant argues that the trial court erred in finding that A.C.'s out-of-court statements were sufficiently reliable. Because the court ultimately decided to disregard A.C.'s statements to M.R. and L.R., we focus on the admissibility of A.C.'s statements to M.A., Kral, and Mullarkey.

¶ 38 "When conducting a reliability determination, a trial court evaluates the totality of the circumstances surrounding the making of hearsay statements." *People v. West*, 158 Ill. 2d 155, 164 (1994). Relevant factors include "the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of similar age, and the lack of a motive to fabricate." *Id.* at 164. We will not disturb the trial court's determination absent an abuse of discretion. *Id.* at 165.

¶ 39 Defendant argues that the timing of A.C.'s disclosures that defendant was abusing her militates against finding sufficient reliability safeguards. However, a child's delay in reporting abuse does not necessarily render the child's statements inadmissible. *People v. Soto*, 2022 IL App (1st) 201208, ¶ 122. The alleged abuse took place from when A.C. was in kindergarten until she was in second grade. She did not report it until she was in fifth grade. Under the circumstances of the case, the delay does not undermine the reliability of A.C.'s statements. When the abuse started, A.C. was of an age when she might not understand the wrongfulness of defendant's conduct and might, in any event, be reluctant to talk about it, particularly after it stopped. However, as she grew older and apparently came to fear that the abuse would resume, it was natural for her to come forward and reveal the abuse to her family.

¶ 40    Defendant challenges A.C.'s statement to Kral solely because it was not spontaneous. The argument has no merit. Although A.C. had previously spoken with relatives about the abuse she experienced, those discussions did not prompt her to speak with Kral. Rather, Kral approached A.C. after noticing that she appeared upset. Kral took A.C. out to the hallway and asked what was wrong. A.C.'s response that defendant had touched her private areas was sufficiently spontaneous to help safeguard its reliability.

¶ 41    Defendant is correct that A.C.'s statements to Mullarkey during the interview at the CAC were not spontaneous. As defendant notes, before Mullarkey's interview, A.C. had spoken to family members, a teacher, and a social worker, and a full investigation of the allegations against defendant was underway. Moreover, the interview aimed to obtain information about A.C.'s accusation against defendant. Nonetheless, as defendant acknowledges, spontaneity is only one factor in determining reliability, not an indispensable element. The trial court found that A.C.'s statements to Mullarkey, though more detailed than the other section 115-10 statements, were nonetheless consistent with them.[1] The court also found that A.C.'s statements to Mullarkey were not the product of suggestive questioning. See *id.* ("asking a child questions is not inherently coercive or suggestive"). We cannot say that the trial court abused its discretion in concluding that A.C.'s hearsay statements to Mullarkey were accompanied by sufficient reliability safeguards for admission under section 115-10.

¶ 42    Although the trial court ruled admissible A.C.'s section 115-10 statements to M.R. and L.R. when the three were together in M.R.'s home, the court ruled at trial that it would not consider

---

[1]We add that this finding is accurate notwithstanding that M.R. and L.R. offered somewhat different accounts of precisely what A.C. said in their joint presence. The general details were sufficiently consistent to bolster the reliability of A.C.'s more detailed statement to Mullarkey.

M.R.'s and L.R.'s testimony as to what A.C. told them. As noted, the court explained that "[L.R.] and [M.R.] testified, both at the [section] 115-10 hearing and at this trial, to hearing [A.C.] saying different things." Although defendant opposed the admission of the statements, he now argues that, because the court found them admissible, it should have considered their evidentiary value for impeaching L.R.'s and M.R.'s trial testimony[2] and casting doubt on A.C.'s veracity. We disagree. L.R. and M.R. gave somewhat inconsistent accounts of their mutual conversation with A.C. Instead of determining which account was more credible, the court simply chose to discount both versions. The court might well have concluded that neither witness's recollection of the conversation was trustworthy, in which case their testimony regarding A.C.'s statements would have no impeachment value.

¶ 43     Defendant also notes that, at the section 115-10 hearing, M.A. testified that A.C. told her not only that defendant made her touch his penis, but also where that abuse took place. At trial, M.A. testified only that A.C. told her that defendant made her touch his penis. As noted, the trial court indicated that it would "consider that [A.C.] told [M.A.] that the defendant had made her touch his private part but not where it occurred." Obviously, the court could not consider evidence not presented at trial. Defendant argues, however, that the court should have considered M.A.'s testimony at the section 115-10 hearing for purposes of impeaching A.C.'s testimony. Defendant

---

[2]Defendant argues that M.R.'s credibility is important because she corroborated A.C.'s testimony that she resided in M.R.'s home with M.A. and defendant when she was five. But that point does not appear to be in dispute. Indeed, defendant's own testimony established that fact. Defendant testified that he moved in with M.A. and M.R. in 2013 and that they lived with their children in M.R.'s home for about two years. A.C., born June 8, 2008, turned five in 2013, so she necessarily lived at M.R.'s home for at least five months between her fifth and sixth birthdays.

fails to explain what impeachment value M.A.'s section 115-10 hearing testimony would have had at trial, given that it apparently was consistent with A.C.'s trial testimony.

¶ 44    We conclude that the trial court did not err in admitting A.C.'s hearsay statements under section 115-10 of the Code.

¶ 45    Defendant next argues that the evidence was insufficient to sustain his convictions. In reviewing a challenge to the sufficiency of the evidence in a criminal proceeding, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Generally, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). "The testimony of a single witness is sufficient to convict where the testimony is positive and credible, even when contradicted by the defendant." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 97.

¶ 46    Defendant contends that the evidence against him was "generic" in the sense we described in *People v. Letcher*, 386 Ill. App. 3d 327 (2008). In *Letcher,* the defendant argued that the State failed to prove the charges of predatory criminal sexual assault of a child because it did not show that the offenses occurred on the dates alleged. *Id.* at 331. We commented:

"There is very little case law in Illinois addressing when generic evidence about the number of offenses in a sexual abuse case may be sufficient to prove guilt beyond a reasonable doubt on all counts. *** As one court in another jurisdiction explained, the issue raises several competing concerns when there are allegedly repeated instances of misconduct by a resident of the victim's home:

' "The so-called 'resident child molester' is a person who lives with his victim or has continuous access to him or her. In such cases, the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults." [Citation.]

The difficulty presented in such cases is clear. On the one hand, prosecutions based on such nonspecific or generic testimony are claimed to deprive the defendant of due process by preventing him from effectively defending against such charges, and by precluding a unanimous jury verdict as to each count in the indictment. [Citation.] On the other hand, "testimony describing a series of essentially indistinguishable acts of molestation is frequently the only testimony forthcoming from the victim. To hold that such testimony, however credible and substantial, is inadequate to support molestation charges would anomalously favor the offender who subjects his victim to repeated or continuous assaults.' [Citation.]" *Id.* at 332-33.

¶ 47    In *Letcher* (*id.* at 333-34), we cited the following passage from *People v. Jones*, 92 P.2d 643, 654-55 (1990):

"It must be remembered that even generic testimony (*e.g.*, an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction. (Of course, prosecutors should exercise discretion in limiting the number of separate counts charged. No valid purpose would be served by charging

hundreds or thousands of separate counts of molestation, when even one count may result in a substantial punishment.)

* * *

*** [I]n determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. [Citations.]

The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (*e.g.*, lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (*e.g.*, 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe the *general time period* in which these acts occurred (*e.g.*, 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (Emphases in original.)

¶ 48 Defendant does not argue that A.C.'s testimony did not satisfy this standard. Instead, he observes that, during her recorded interview with Mullarkey, A.C. gave a more specific and detailed account of the abuse than she had given to the witnesses at the section 115-10 hearing.

Thus, according to defendant, the nature of A.C.'s statements to Mullarkey showed that she was "able to describe incidents with specificity." (Emphasis added.) Defendant goes on:

"If [A.C.] can only give generalized generic testimony, then the [*Lechter*] analysis is appropriate; but if she can give specific facts about specific events, then her testimony should have been held to a much higher scrutiny, requiring the State to charge more specific incidents with specific facts to be proven, which would have allowed [d]efendant to better defend against A.C.'s allegations."

¶ 49    In essence, defendant asks us to recognize different reasonable-doubt standards for cases involving different categories of child sex offense victims. Defendant cites no authority and offers no reasoned argument in support of such a radical departure from the accepted unitary standard for reviewing the sufficiency of the evidence in a criminal case. Accordingly, the argument does not merit appellate review, and we will not consider it. See Ill. S Ct. R. 341(h)(7) (eff. Oct 1, 2020) (argument section of appellant's brief must present "the contentions of the appellant and the reasons therefor, with citation of the authorities ***. *** Points not argued are forfeited ***.")

¶ 50    Defendant next points to inconsistencies and discrepancies in certain witnesses' section 115-10 hearing and trial testimony. First, "[M.R.] stated at the [section] 115-10 hearing that A.C. did not tell her where the touching occurred, and [M.R.] did not ask," yet "L.R.'s [section] 115-10 statements were that [M.R.] did in fact ask [A.C.] where this occurred and A.C. responded at the [Aurora home], as well as the home where [d]efendant was subsequently living with [B.M.]." Second, M.A.'s section 115-10 hearing testimony "disclosed that A.C. told her that defendant made her touch his private parts at [M.R.'s home in Montgomery] *** yet, at trial, [M.A.][3] made

---

[3]Defendant referenced M.R. here but this was evidently a mistake, as he cited the transcript pages containing M.A.'s trial testimony.

no reference to learning where the incidents occurred during that same meeting." Defendant recognizes that the trial court "took steps, ultimately, to disregard some of this testimony"—specifically, by refusing to consider M.R.'s and L.R.'s trial testimony regarding A.C.'s statements to them. Nonetheless, defendant claims that the foregoing conflicts "cast[ ] ultimate doubt on the reliability of A.C.'s statements, both during the Mullarkey interview and at trial." However, it is the trial court's function—not ours—to resolve conflicts and inconsistencies in the evidence and determine the credibility of the witnesses and the weight to be given to their testimony. The trial court found A.C. credible in her reports of hand-to-penis contact. The not-guilty findings on the remaining counts were not based on determinations that A.C. lied but, rather, on determinations that she misconstrued situations, particularly as to whether defendant was touching her for the purpose of sexual gratification or arousal. As is well-established, "the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Siguenza-Brito*, 235 Ill. 2d at 228. The trial court had not only A.C.'s testimony but also her section 115-10 statements to Mullarkey. In our view, the conflicts defendant identifies are ultimately collateral. He certainly identifies nothing that so seriously undermines A.C.'s credibility as would justify substituting our judgment for the trial court's.

¶ 51    Defendant also observes that the trial court did not discuss the credibility of his testimony in as much detail as he discussed A.C.'s credibility. Defendant does not contend that the trial court was under any obligation to do so, but he laments that the generality of A.C.'s testimony impeded his ability to mount a persuasive defense. As previously discussed, however, per *Lechter*, the generality of A.C.'s testimony did not render it insufficient to sustain defendant's convictions.

¶ 52                            III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 54    Affirmed.